ELIZABETH SADLOWSKI ET AL. *v.*
TOWN OF MANCHESTER ET AL.
(13227)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

Argued February 3—decision released March 15, 1988

*Edward F. Hennessey,* with whom were *S. Frank D'Ercole, Kevin M. O'Brien* and *John W. Cooney,* town attorney, for the appellants (named defendant et al.).

*Bourke G. Spellacy,* with whom, on the brief, were *R. Dial Parrott, Amy S. McCabe* and *Karen P. Blado,* for the appellants (Homart Development Company et al.).

*Kathleen Eldergill,* for the appellees (plaintiffs).

PETERS, C. J. General Statutes § 8-192 (a)[1] authorizes a municipality to issue tax increment bonds with the approval of its local "legislative body." The sole issue in this case is how to reconcile this reference to "legislative body" with the provisions of a local charter that stipulate that municipal bonds generally must

---

[1] General Statutes § 8-192 (a) provides: "BOND ISSUES. FEDERAL AND STATE AID. TAXES. TEMPORARY NOTES. (a) For the purpose of carrying out or administering a development plan or other functions authorized under this chapter, a municipality, acting by and through its development agency, is authorized, without limiting its authority under other provisions of law, to issue from time to time bonds of the municipality which are payable solely from and secured by: (1) A pledge of and lien upon any or all of the income, proceeds, revenues and property of development projects, including the proceeds of grants, loans, advances or contributions from the federal government, the state or other source, including financial assistance furnished by the municipality or any other public body pursuant to this chapter; (2) taxes, in whole or in part, allocated to and paid into a special fund of the municipality pursuant to the provisions of section 8-192a; or (3) any combination of the methods in subsections (1) and (2) of this section. Any bonds payable and secured as provided in subsection (2) or (3) of this section shall not be issued without the approval of the local legislative body and such bonds may provide for the deferral of principal payments for a period not in excess of five years from the date of issuance of such bonds. Bonds issued under this section shall be in such form, mature at such time or times, bear interest at such rate or rates, be issued and sold in such man-

be authorized by a two step process including not only the approval of the local board of directors but also the favorable action of the voters of the town. The plaintiffs, residents, taxpayers and electors of the town of Manchester, brought this action against the defendants, the town of Manchester and its economic development commission, to enjoin the issuance of tax increment bonds until their approval by a referendum.[2] Homart Development Corporation and the Mall at Buckland Hills Partnership were permitted to join the action as party defendants. In their answers to the complaint, the defendants responded that, as a matter of law, such bonds could validly be issued without a referendum. Faced with opposing motions for summary judgment, the trial court ruled in favor of the plaintiffs. The defendants have appealed. We find error.

The facts are undisputed. The defendants have proposed the construction of a regional shopping center in the northern part of Manchester. Planning for the

ner, and contain such other terms, covenants and conditions as the development agency, by resolution, determines. Such bonds shall be fully negotiable, shall not be included in computing the aggregate indebtedness of the municipality and shall not be subject to the provisions of any other law or charter relating to the issuance or sale of bonds, provided, if such bonds are made payable, in whole or in part, from funds contracted to be advanced by the municipality, the aggregate amount of such funds not yet appropriated to such purchase shall be included in computing the aggregate indebtedness of the municipality. As used in this section, 'bonds' means any bonds, including refunding bonds, notes, interim certificates, debentures or other obligations.''

[2] The plaintiffs originally filed a two count complaint challenging the issuance of the tax increment bonds. The first count alleged a violation of the charter requirement for approval of bonds by a majority of the voters of the town of Manchester. That is the count presently before us. The plaintiffs have withdrawn the second count, which alleged that the use of the moneys proposed to be raised by the bonds would not be an expenditure for a "public use and purpose" within the meaning of General Statutes § 8-186. On their side, the defendants have not pursued their motion to dismiss the complaint, which was grounded on a challenge to the plaintiffs' standing to pursue their cause of action.

project contemplates some form of assistance from the town to finance needed traffic, water and sewer improvements. Accordingly, the town, represented by appropriate agencies including its economic development commission and its board of directors, proposed the issuance of "tax increment bonds" pursuant to the authority of § 8-192 in a principal amount not to exceed $13,000,000. After a public hearing held on August 27, 1987, a bond authorization resolution was approved by the economic development commission on August 31, 1987, and by the board of directors on September 1, 1987.

The plaintiffs' lawsuit challenged the authority of the town to issue "tax increment bonds" without the approval of the voters at a town referendum. Although the board of directors is the local legislative body for most purposes, the plaintiffs maintained that the board lacks plenary authority over the issuance of municipal bonds. Such bonds, according to the plaintiffs, fall within the terms of § 5-25 of the Manchester town charter, which permits the town to "incur indebtedness by issuing its negotiable bonds" only if such bonds are "authorized by a majority vote of all the members of the Board of Directors" and approved "by the voters of the Town."[3]

The trial court agreed with the plaintiffs. The court recognized that § 8-192 authorizes tax increment bonds that, in their provenance and in their impact on local tax resources, differ from general municipal obligation

[3] Section 5-25 of the Manchester town charter provides in relevant part: "BORROWING FOR CAPITAL IMPROVEMENTS. To finance all or any part of the expense of any capital project which the Town may lawfully construct or acquire, the Town may incur indebtedness by issuing its negotiable bonds . . . subject to the limitations of the General Statutes. Such bonds shall be authorized by a majority vote of all the members of the Board of Directors. No bonds . . . shall be issued, however, until the project for which the bonds . . . are to be issued has been favorably acted upon by the voters of the Town at any regular or special election duly warned for that purpose."

bonds. The court held nonetheless that Manchester's town charter requires tax increment bonds to be approved by a town referendum in addition to the affirmative vote of the town's board of directors. For this reason, the court rendered judgment in favor of the plaintiffs, enjoining the issuance of the tax increment bonds "until the development project has been favorably acted upon by the voters of the town in accordance with section 5-25 of the charter." The defendants took a timely appeal to this court.

In their appeal, the defendants urge us to overturn this judgment and to direct summary judgment in their behalf. They contend that the trial court's conclusion that a referendum was required was in error because: (1) § 5-25 of the Manchester charter was not intended to apply to the issuance of tax increment bonds under § 8-192; (2) the term "legislative body" used in § 8-192 of the General Statutes refers only to Manchester's board of directors and not to its voters; and (3) § 8-192, by its own terms, supersedes local charter provisions relating to the issuance or sale of bonds.[4] We agree with the defendants in principle.

## I

Before we reach the merits of the defendants' claims of error, we must consider whether events have so overtaken this litigation that the appeal has become moot. Mootness implicates the subject matter jurisdiction of this court. We have consistently held that we do not render advisory opinions. If there is no longer an actual controversy in which we can afford practical relief to the parties, we must dismiss the appeal. *Board of Edu-*

---

[4] The defendant developers also question whether the plaintiffs have met their burden of showing irreparable harm and lack of an adequate remedy at law, both of which are necessary prerequisites for injunctive relief. Because of our resolution of the defendants' other claims of error in their favor, we need not reach these issues.

*cation* v. *Board of Labor Relations,* 205 Conn. 116, 124–25, 530 A.2d 588 (1987); *Shays* v. *Local Grievance Committee,* 197 Conn. 566, 571, 499 A.2d 1158 (1985); *Connecticut Foundry Co.* v. *International Ladies Garment Workers Union,* 177 Conn. 17, 19, 411 A.2d 1 (1979); *Reynolds* v. *Vroom,* 130 Conn. 512, 515, 36 A.2d 22 (1944).

The plaintiffs urge us to dismiss this appeal on the ground of mootness. Although we lack a formal record of the events that transpired subsequent to the judgment of the trial court, it appears to be undisputed that, as a result of that judgment, the board of directors voted to hold a referendum to obtain voter approval of the proposed tax increment bonds. On November 3, 1987, the Manchester voters rejected the proposed bond issue. Since that time, the Manchester board of directors and the developers have been engaged in negotiations for an alternate method of financing that would substitute a partial tax abatement for tax increment bonding. These negotiations have not yet been finalized, and their validity is coming under renewed challenge.

Given this uncertain state of the record, we agree with the defendants that they are entitled to an appellate resolution of their claims of error. Lacking assurance that there is no longer any practical relief that we can afford the parties, we are obligated to consider their appeal on its merits. Our decision will not only clarify the authority of the town of Manchester to issue tax increment bonds in the future, but will, in all likelihood, enable the present defendants to pursue their claims concerning the tax increment bonds to which they have previously agreed.

II

In order to address the defendants' specific claims of error, we can usefully begin with a description of

tax increment bonds. Tax increment bonds are sui generis. They are authorized by a special chapter of the General Statutes, chapter 132, §§ 8-186 through 8-200b, enacted in 1967 to facilitate municipal development projects. For this purpose, § 8-192 (a) permits municipalities to issue bonds "which are payable solely from and secured by: (1) A pledge of and lien upon any or all of the income, proceeds, revenues and property of development projects, including the proceeds of grants, loans, advances or contributions from the federal government, the state or other source, including financial assistance furnished by the municipality or any other public body pursuant to this chapter; (2) taxes, in whole or in part, allocated to and paid into a special fund of the municipality pursuant to the provisions of section 8-192a; or (3) any combination of the methods in subsections (1) and (2) of this section." Tax increment bonds differ from the municipal bonds that chapter 109 of the General Statutes authorizes municipalities to issue for capital improvement projects. In contradistinction to tax increment bonds, general municipal obligation bonds engage the borrowing power of a municipality and are repayable from its tax base; for that reason, the legislature has imposed ceilings on the aggregate amount of such indebtedness that a municipality may undertake. General Statutes §§ 7-369, 7-374. Tax increment bonds are excluded from such ceilings by § 8-192 (a) unless portions of the bond repayment have been advanced from town funds. Because no such advance has been made in this case, the trial court recognized that "[these] bonds will not be a general obligation of the town, other tax revenues of the town will not be used to repay them, and they will not affect the plaintiffs' taxes."

A

From this perspective, we turn to the defendants' claim that the trial court erred in concluding that § 5-25

of the Manchester charter applies to tax increment bonds issued pursuant to § 8-192 (a). The defendants maintain that the referendum that the charter prescribes for the financing of "any capital project which the Town may lawfully construct or acquire" pertains only to those capital improvements that are funded by general municipal obligation bonds and not to municipal development projects funded by tax increment bonds. We agree.

In order to determine the proper scope of § 5-25, we must examine the language of the section itself and of related provisions of the charter that may shed light on the charter's intent and purpose. See *Galvin* v. *Freedom of Information Commission,* 201 Conn. 448, 456, 518 A.2d 64 (1986); *Shelby Mutual Ins. Co.* v. *Della Ghelfa,* 200 Conn. 630, 637, 513 A.2d 52 (1986); *Peck* v. *Jacquemin,* 196 Conn. 53, 63, 491 A.2d 1043 (1985). Looking at the charter as a whole, we are persuaded that the only bonding governed by § 5-25 is general municipal obligation bonding that constitutes a charge on the town's taxpayers. Indeed, in 1947, when the Manchester charter was first adopted, other forms of municipal bonding, such as tax increment bonds, had not yet been authorized by the General Assembly. Furthermore, the bonding provisions in the charter reflect the understanding that they are designed to implement general municipal obligation bonds for which the taxpayers will be indebted. Notably, the prefatory language in § 5-25 describes the borrowing that is subject to referendum as financing by which "the Town may incur indebtedness . . . ." That theme is echoed in other parts of the charter. Section 19-1,[5] dealing with

---

[5] Section 19-1 of the Manchester town charter provides: "GENERAL POWER OF TOWN OF [TO] ISSUE BONDS, NOTES AND CERTIFICATES OF INDEBTEDNESS. The Town of Manchester is authorized to issue negotiable bonds under its corporate name and seal and notes or other certificates of debt upon the credit of the Town, for the purposes hereinafter specified, which bonds, notes or other certificates of indebtedness shall be obligatory upon the Town

bond issues, refers to § 7-371 of the General Statutes, which regulates general municipal obligation bonds that have such tax implications. In the same part of the charter, § 19-6[6] provides rules to implement the tax consequences of bonding. The charter provisions dealing with capital programs contain similar fiscal regulations. For example, § 5-2 (a)[7] requires capital improvement funding to be reflected in the annual budget. All of these charter provisions support an interpretation of § 5-25 that limits its application to financing in the form of general municipal obligation bonds.

and the inhabitants thereof according to the purport and tenor of same; provided each issue of bonds made under the authority hereof, for the purpose of obtaining funds for a period longer than one year, shall be in serial form, payable in accordance with the provisions of section 7-371 of the General Statutes, as the same may from time to time be amended.''

[6] Section 19-6 of the Manchester town charter provides: ''BOARD OF DIRECTORS; DUTY TO LAY SPECIAL TAX. When the Board of Directors shall approve a budget and authorize expenditures, it may provide for the issuance of bonds to pay for any part thereof which is to be spent for permanent improvements which are properly a charge upon capital, and the Board of Directors shall lay a tax at least sufficient with other income of said Town to be received during such budget year, as is estimated, to defray the balance of such budget of authorized expenditures including principal of and interest upon and any amortization charge in respect of all bonds and notes payable in such budget year, except bonds and notes for waterworks or sewerage systems or other purposes which are payable as to principal and interest solely from revenues or assessments and including all ascertained deficiencies in the revenues of the preceding year and including also an adequate charge for the proper maintenance in good repair and working order or for depreciation of all permanent improvements then made or hereafter to be paid for out of the proceeds of bonds not so excepted.''

[7] Section 5-2 (a) of the Manchester town charter provides in part: ''PREPARATION. The General Manager shall prepare and, not less than ninety-five days prior to the beginning of each fiscal year, shall submit to the Board of Directors a tentative budget for the ensuing fiscal year and an explanatory budget message. Such tentative budget shall, where possible, include a statement of receipts during the last-completed fiscal year, the receipts for the first six months of the current fiscal year, an estimation of receipts for the entire fiscal year and an estimation of receipts during the ensuing fiscal year, all itemized in accordance with a classification approved by the Board of Directors. Such budget shall also, where possible, include a statement of the expenditures during the last-completed fiscal year, the expen-

The plaintiffs' arguments to the contrary do not address the particulars of the language of the Manchester charter or the interrelationship between the charter and the General Statutes. They rely instead on general principles that may well be sound but are not directly relevant. Whatever may be the general scope of municipal bonds defined in *City of Stamford* v. *Town of Stamford,* 107 Conn. 596, 610, 141 A. 891 (1928), we are concerned in this case with a special form of bonding that forms an exception from municipal obligations that "are evidences of indebtedness, issued by . . . towns." Whatever may be the constitutional jeopardy of tax increment bonds in other jurisdictions with special state constitutional provisions that regulate bonding; *Tucson* v. *Corbin,* 128 Ariz. 83, 623 P.2d 1239 (1980); we are not faced with a constitutional challenge in this case. Whatever may be the authority of a state treasurer to issue other forms of limited obligation bonds; *State ex rel. Finance Committee* v. *Martin,* 62 Wash. 2d 645, 384 P.2d 833 (1963); we are confronted with the special position of tax increment bonds in the Connecticut scheme of municipal development financing. We therefore agree with the defendants that tax increment bonds were not intended to be included within the class of capital improvement bonds for which § 5-25 of the Manchester charter prescribes approval by referendum.[8]

ditures during the first six months of the current fiscal year, an estimation of the expenditures for the entire current fiscal year, the appropriations requested and the recommendations of the General Manager, all itemized by departments and in accordance with a classification by object of expenditure approved by the Board of Directors. Said budget message shall state the reason for any material increase or decrease in the estimate for the coming year of any item of receipts or expenditures from that for the current fiscal year."

[8] The persuasiveness of cases from two other jurisdictions, upon which the plaintiff relies for the proposition that tax increment bonds create indebtedness; *Neff* v. *Jacksonville,* 139 Fla. 179, 190 So. 468 (1939); *Miller* v. *Covington Development Authority,* 539 S.W.2d 1 (Ky. 1976); has been

## B

Our conclusion that § 5-25 of the Manchester charter does not include tax increment bonds does not, however, dispose of all of the issues. Although the validity of tax increment bonds does not turn directly on the terms of § 5-25, we must still decide how to reconcile the provisions of the Manchester charter with the requirement of § 8-192 (a) that tax increment bonds must be approved by the local "legislative body." The trial court agreed with the plaintiffs that, in the town of Manchester, at least for bonding purposes, the local "legislative body" is comprised of the town's board of directors together with its voters exercising legislative powers through a referendum. The defendants maintain that the applicable provisions of the General Statutes compel a different result.

The term "legislative body" is defined by General Statutes § 7-193 (a) (1) as follows: "(A) A town meeting; (B) a representative town meeting; (C) a board of selectmen, council, board of directors, board of aldermen or board of burgesses; or (D) a combination of a town meeting or representative town meeting and one of the bodies listed in subparagraph (C)." The trial court concluded that the voters of Manchester, acting on a referendum, constituted a town meeting, and that the town's "legislative body" therefore fell within the combination of "town meeting" and "board of directors" authorized by § 7-193 (a) (1) (D). This ruling can only be sustained if voters exercising legislative power by voting on a referendum can be said to be a town meeting. We hold that they cannot.

We note at the outset that the Manchester charter nowhere designates its provision for a referendum as

diminished by subsequent holdings in those jurisdictions. *State* v. *Miami Beach Development Agency,* 392 So. 2d 875 (Fla. 1980); *Hayes* v. *State Property & Building Commission of Kentucky,* 731 S.W.2d 797 (Ky. 1987).

the equivalent of a town meeting. For us to imply such an equivalence would fly in the face of reality. In ordinary usage, the term "meeting" means an assembly or a gathering for political, social, religious or economic purposes. N. Webster, Third New International Dictionary. We have taken judicial notice of the fact that "[i]n a Connecticut town which has a town-hall, the words 'town meeting' connotes a meeting in the town-hall." *Portland Water Co.* v. *Portland,* 97 Conn. 628, 635, 118 A. 84 (1922). In *Pollard* v. *Norwalk,* 108 Conn. 145, 146, 142 A. 807 (1928), upon which the plaintiffs attempt to rely, this court cited *Brooklyn Trust Co.* v. *Hebron,* 51 Conn. 22, 29 (1883), for a description of a town meeting as an occasion on which "[t]he assembled voters" are, upon proper "warning," empowered to act. Thus a referendum in which individual voters cast individual ballots in individual voting booths does not constitute a town meeting.

The distinction between legislative power exercised in a town meeting and legislative power exercised in a referendum is underscored by other provisions, both in the General Statutes and in the Manchester charter. Section 7-193 (a) (1) of the General Statutes specifies that when a local legislative body consists of a combination of town meeting and board of directors, "the body having the greater number of members shall have the power to adopt the annual budget . . . ." If voter approval by way of referendum were to constitute a town meeting, then, under § 7-193, such voter approval would be required to enact the Manchester town budget. The Manchester charter, however, in the relevant provisions of §§ 3-1, 3-9, 5-3 through 5-8 and 5-10,[9] vests exclusive budgetary authority in the board

[9] Section 3-1 of the Manchester town charter provides: "BOARD OF DIRECTORS; GENERAL POWERS. The Board of Directors shall, except in matters under the jurisdiction of the Board of Education and except as otherwise specifically provided in this Charter, exercise all the legislative powers of

of directors. In order to make both the statutes and the charter workable, Manchester's board of directors

the Town. Further, all legislative rights, powers and duties of the Town and the powers of appointment to all boards, agencies and commissions not otherwise vested by this Charter, are exclusively vested in the Board of Director[s]. It shall have, in addition to all powers and duties conferred and imposed upon it by this Charter, all the powers and duties now or hereafter conferred or imposed by the General Statutes on town boards of selectmen, relating to the abatement of taxes. The final authority concerning a budget and tax rate is vested exclusively in the Board of Directors subject to the provisions of Section 10 of this Chapter. . . . Except to the extent to which such powers are conferred upon the Town Planning Commission, the Board of Directors shall exercise the powers hitherto possessed by the Town meeting and the Board of Selectmen relative to the collection of benefits due the Town from the establishment of any building, street, sidewalk or curb or tree line or benefits accruing from the opening or improvement of any street or highway, including the assessment of a portion of the cost thereof on the owners of abutting property, and such powers are extended to include the construction and assessment of the cost of highways, sidewalks, curbs, gutters, sewers and drains. The Board of Directors shall have the power to make, alter and repeal ordinances and by-laws, not inconsistent with this Charter or the general laws of the State, for the execution of the powers vested in the Town as provided in Chapter I of this Charter, for the government of the Town and the management of its business and for the preservation of the good order, peace, health and safety of the Town and its inhabitants. Such ordinances and by-laws shall be binding upon all the inhabitants of the Town and upon persons coming within its limits. . . .

"The Board of Directors shall authorize all purchases of real estate by the Town and all sales of real estate owned by the Town by ordinance, which ordinance shall be enacted in compliance with Section 3-8 and shall be subject to the provisions of Sections 3-9 and 3-10, except that all sales and purchases connected with redevelopment and urban renewal as provided in Chapter 130 of the Connecticut General Statutes, Revision of 1958, as amended, and all condemnation proceedings are excluded from the operation of this section."

Section 3-9 of the Manchester town charter provides: "PETITION FOR OVERRULE. No ordinance or by-law adopted by the Board of Directors, except those making appropriations, or fixing the tax rate, as provided in Chapter V of this Charter, shall become effective until it shall have been advertised in full at least three times in a newspaper having a general circulation in the Town and a period of ten days from the date of the third such advertisement shall have elapsed, during which ten days no petition for a referendum on the ordinance shall have been filed in accordance with the provisions of this Section. If, within ten days after the third publica-

must be deemed to be its sole legislative body for the purposes of §§ 8-192 (a) and 7-193.

tion of any such ordinance, a petition signed by not less than five per cent of the electors of the Town, as determined from the latest official lists of the Registrars of Voters, is filed with the Town Clerk requesting its reference to a special Town election, the Town Clerk shall, within ten days thereafter, fix the day and the place of such election and certify the same to the General Manager, and such election shall be called and held in accordance with the provisions of the General Statutes and this Charter for calling and holding a Town election. Any ordinance so referred shall become effective upon the conclusion of such election unless a majority of those voting thereat shall have voted in the negative on a 'yes' and 'no' vote on the question as to whether the ordinance or by-laws should be adopted. Said petition for overrule may be submitted to the electors at a Town election if said Town election occurs within sixty days of the filing of said petition."

Sections 5-3 though 5-8 of the Manchester town charter provide: "Sec. 5-3. PUBLICATION. The budget and budget message and all supporting data shall be a public record in the office of the General Manager and shall be open to inspection at any reasonable time by any elector or taxpayer. The General Manager shall cause the tentative budget and budget message to be advertised in the same manner as provided for giving notice of a public hearing in Section 3-8 of this Charter. The third such advertisement of the tentative budget and budget message shall appear not less than ninety days prior to the beginning of the ensuing fiscal year.

"Sec. 5-4. PUBLIC HEARINGS. The Board of Directors shall hold a public hearing not less than eighty-five days prior to the beginning of the fiscal year at which any elector or taxpayer may have an opportunity to be heard. The Board of Directors shall determine the date of the hearing and shall cause a notice of the hearing to be published in a newspaper having a general circulation in the Town not less than three times and not less than five days prior to the date of the hearing. The hearing may be adjourned from time to time by the Board of Directors as it shall deem necessary.

"Sec. 5-5. CONSIDERATION BY THE BOARD. After the conclusion of the public hearing the Board of Directors shall continue its consideration of the tentative budget. The Board of Directors may revise any of the estimates of receipts or of expenditures for the ensuing fiscal year except that before inserting any new item of expenditure or increasing any item of expenditure either over the amount requested by any department or recommended by the General Manager, whichever amount shall be greater, it must call another public hearing, giving notice of such hearing in the same manner as provided for giving notice of a public hearing in Section 3-8 of this Charter. The notice of such hearing shall state the nature of the proposed additions or increases.

"Sec. 5-6. ADOPTION. The final budget shall be adopted by the Board of Directors not less than fifty-five days prior to the beginning of the fiscal

Our conclusion that a referendum is not a "legislative body" is reenforced when we compare § 7-193 with other related statutes governing the same subject matter. See *Dart & Bogue Co.* v. *Slosberg,* 202 Conn. 566, 575, 522 A.2d 763 (1987), and cases there cited. We have found no statutes that suggest an equivalence between legislative body and referendum, or between town meeting and referendum. On the contrary, statutes such as §§ 7-427 and 9-164c contain legislative mandates to municipalities that expressly require the approval of both the local "legislative body" and a "referendum" of its electorate.

year. Should the Board of Directors take no final action to adopt the budget on or before the fifty-fifth day prior to the beginning of the ensuing fiscal year, the tentative budget submitted by the General Manager shall be deemed to have been finally adopted by the Board of Directors and it shall be the legal budget of the Town for the fiscal year ensuing.

"Sec. 5-7. CERTIFICATION. A copy of the budget as finally adopted shall be certified by the General Manager and recorded in a book kept for that purpose in the office of the Town Clerk. From the date of the beginning of the fiscal year the several amounts stated in the budget as proposed expenditures shall be and become appropriated to the several objects and purposes therein named.

"Sec. 5-8. ADDITIONS. Whenever the Board of Directors shall deem it necessary because of conditions unforseen at the time of the preparation of the annual budget, and in the best interests of the Town to do so, it may, by majority vote of all its members, make additional appropriations to the Board of Education or to any office, department or agency of the Town government and may make appropriations for purposes not included in the final budget but only after a public hearing to be advertised in the same manner as provided for giving notice of a public hearing in Section 3-8 of this Charter. At such hearing any elector or taxpayer of the Town may have an opportunity to be heard. Whenever any such additional or new appropriation increases the total of the expenditure side of the budget, additional means of financing in a like amount shall be provided in such manner as may be determined by the Board of Directors."

Section 5-10 of the Manchester town charter provides: "TAX RATE. The Board of Directors, at the meeting wherein the final budget is adopted in accordance with Section 6 of this Chapter, shall also fix a tax rate which shall be sufficient, together with estimated receipts from other sources, to equal the sum of all appropriations which have been made, including any deficit from the prior year. This Section shall not be construed to prevent the issuing of bonds to finance public improvements."

As we have interpreted the operative provisions of §§ 8-192 (a) and 7-193, Manchester's board of directors is the local legislative body whose approval is required for the issuance of tax increment bonds. The Manchester charter does not incorporate the type of combination legislative body that § 7-193 recognizes. There is therefore no conflict between the statutes and the charter. Were there to be such a conflict, however, it is worth noting that § 8-192 (a) expressly provides that the rules that it prescribes for the issuance of tax increment bonds "shall not be subject to the provisions of any other law or charter relating to the issuance or sale of bonds." The plaintiffs have not challenged the power of the General Assembly to override local charter provisions that conflict with legislative policy. See *Shelton* v. *Commissioner*, 193 Conn. 506, 521–23, 479 A.2d 208 (1984).

The trial court was therefore in error when it ruled that the town of Manchester's board of directors could not approve the issuance of tax increment bonds without seeking the further approval of a town referendum. This conclusion of law is unaffected by the fact that such a referendum was subsequently held, and went down to defeat. We have no record upon which to determine whether other events following the trial court's judgment have affected the board's approval of the bond issue. We therefore remand the case for a further hearing to determine the present status of that approval.

There is error, the judgment is set aside and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.